IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG

CRUCITA VAYE KENDLE,
               Plaintiff,

v.                                           Civil Action No. 3:16-CV-27
                                           (JUDGE GROH)

CAROLYN W. COLVIN,
ACTING COMMISSIONER OF SOCIAL SECURITY,
               Defendant.

## REPORT AND RECOMMENDATION/OPINION

Crucita Vaye Kendle ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Defendant, Commissioner of the Social Security Administration ("Defendant"), denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. §§ 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I.       PROCEDURAL HISTORY

Plaintiff filed an application for DIB on August 22, 2012, alleging disability beginning on July 7, 2012. Plaintiff's application was denied at the initial level on March 29, 2013, and at the reconsideration level on September 12, 2013. Plaintiff thereafter requested a hearing, which Administrative Law Judge ("ALJ") John T. Molleur held on November 8, 2013. Plaintiff was represented by H. K Carpenter at the hearing (but is represented by attorney Jan Dils, generally). Plaintiff and Patricia G. McFann, Vocational Expert ("VE"), testified at the hearing. The ALJ entered a decision on November 21, 2014 finding Plaintiff was not disabled. Plaintiff appealed

this decision to the Appeals Council. On January 11, 2016, the Appeals Council denied

Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.

## II.      FACTS

### A. Personal History

Plaintiff testified as to her personal information at the administrative hearing on

November 4, 2014. She was born on July 5, 1957, and was fifty-seven (57) years old at the time

of the hearing (R. 64). She was currently married, and lived with her husband in Middlebourne,

West Virginia. Id. She graduated from high school, her highest level of education. Id.

### B. Relevant Medical History Summary[1]

#### 1. Carpal Tunnel and hand issues

Plaintiff was diagnosed with carpal tunnel as early as February 10, 2006 as per records

from Plastic Surgery, Inc., noting on that date that she has "mild intermittent carpal tunnel

symptoms still" (R. 443). She was searching for employment that she would be able to do with

her restrictions from carpal tunnel, and was "hopeful to either get a new job or vocational

training." Id. At her next visit on October 10, 2006, notes indicate that she "tried pizza making

for a while but that was too hard on her hands." Id. She was currently working in receiving at

Cabela's and apparently conveyed that she was hoping to get a housekeeping job. Id.

The next visit to Plastic Surgery on February 15, 2008 found Plaintiff employed

"working with homebound mentally challenged patients," that she "seem[ed] to like that a lot"

(R. 443). However, her carpal tunnel symptoms were exacerbated at this visit despite having had

three injections, and an EMG showed slowing of the right median nerve (R. 444). Dr. Kappell

---

[1] Certain (few) portions of Plaintiff's medical records consist of notes regarding issues not relevant here, such as eye examinations, doctor's visits for colds, urinary tract infections, nasal staph infections, bacterial vaginosis, mammograms, etc. To the extent that those portions of Plaintiff's medical records are not germane to the issues now before the Court, they have been excluded from this review.

recommended decompression surgery. Id.  Plaintiff underwent decompression surgery on her right arm on August 19, 2008, and on her left arm on November 20, 2008 (R. 445).

On July 16, 2009, Plaintiff sustained an impacted pilon fracture at the base of her left "small" (presumably, pinky) finger, with pain primarily in the PIP joint (R. 446-47). Doctors inserted pins, and Plaintiff had a dynamic traction splint applied (R. 448). Physical therapy for the finger was also recommended, though Plaintiff did not ultimately attend because she was doing well, and her finger was functional as of October 1, 2009 (R. 452). As of December 3, 2009, Dr. Mueller noted:

> Ms. Kendle is . . . making beautiful progress with motion in the small finger up to 203 degrees active motion and 218 passive . . . no limitations in function except occasionally coins can slip through the ulnar side of her fist.
> I think we can discharge her to follow up as needed at this point. She is going to continue her exercises at home and if she has any trouble she knows to call and we will be happy to see her anytime. (R. 453).

### 2. Neurodiagnostics Report and Neurological issues

On October 5, 2011, Dr. Srini Govindan reviewed Plaintiff's polysomnograph and conducted a neurological examination, the results of which both largely appeared normal (R. 297). However, Dr. Govindan recommended a Titration PSG study in regard to apneas; he also noted that Plaintiff's condition had worsened since a prior polysomnograph in May 2008, and she still complained of memory problems and tiredness (R. 297-8).

Plaintiff gain saw Dr. Govindan on November 7, 2013 because her migraines were getting worse (R. 485). Neurological problems included "gait balance disturbance, headache, [and] migraine;" Plaintiff exhibited decreased sensation in her left leg, and decreased reflexes generally (R. 488).

### 3. Depression and Anxiety

On February 7, 2012, Plaintiff was seen by Gary Nichols, M.D. reporting with a history of GERD, irritable bowel syndrome, hypertension, deep vein thrombosis, low back pain, general anxiety disorder, COPD, constipation, sleep apnea, and IgA deficiency (R. 377). She complained of worsening depression and anxiety symptoms, pursuant to increasing social stressors at home and family problems. Id. She had been experiencing crying episodes, irritability, trouble sleeping, and low appetite over the past two months. Id. Dr. Nichols observed her demeanor as "pleasant," but also "tearful at times." Id. She was already taking the maximum dose of Cymbalta at that time, as well as Klonopin three times a day. Id. She had tried Zoloft in the past, but it had no effect; Dr. Nichols' treatment plan was to wind down her Cymbalta dosage and switch to Prozac. Id.

On March 8, 2012, she was seen by Liz Harshberger at Crittenton Services, Inc. pursuant to anxiety and depression:

> [S]he has been depressed since her mother died about 3 years ago. Additional stressors have been the death of her uncle, marital problems (with some physical abuse), and conflicts with her husband's family. She has the following symptoms: depression, anxiety, poor appetite with weight loss of 21 pounds, sleep difficulties, irritability, poor concentration, low self esteem, decreased energy, withdrawal from others, decreased interest in activities.

(R. 478). Assessments indicated that Plaintiff often cried and felt anxious, depressed, irritable, withdrawn, hopeless and short tempered (R. 469-70). She reported conflict (arguments with her husband and his family), trouble concentrating, and low self esteem. Id. She reported suffering from insomnia and chronic back and leg pain (R. 470). "Somatic concerns and anxiety [were] moderately severe," and that "depression, guilt, and hostility are at moderate" (R. 476). Clinical impressions included "Major Depressive Disorder, recurrent, moderate," problems with primary support group (Axis IV), and moderate symptoms or difficulty in social impairment,

occupational, or social functioning (Axis V) (R. 474-75). Treatment strategies identified at that assessment included participation in therapy twice monthly – addressing grief issues, self esteem, ways to manage mood, and marital problems – as well as cognitive behavioral therapy. Id.

Plaintiff returned to Dr. Nichols on April 10, 2012 (R. 375). She reported no side effects from switching to Prozac, but although her mood is good in the morning (rated 8/10), it is much worse in the evening (3/10), and she has a great deal of irritability. Id. Dr. Nichols adjusted her Prozac dosage with a follow-up in four months for depression and anxiety. Id. Her follow-up on August 8, 2012 is incomplete as only half the page has scanned in the medical record, but from what is visible, it appears to provide no new information (R. 373).

### 4. Left leg issues: pain, instability, and numbness.

On January 19, 2012, Plaintiff had an x-ray on her left ankle following a recent fall. Radiologist Phillip Strohl, M.D. reviewed her images and observed:

> The bones are slightly osteopenic. I believe there is a Mach band overlying the medial aspect of the lateral malleolus related to superimposed tibial structures. There is a small bony density adjacent to the lateral aspect of the calcaneus. This is concerning for a small avulsion fracture at the origin of the extensor digitorum brevis muscle. Clinical follow-up is suggested.

(R. 520). Plaintiff reported that she was working as a home health aide when her knee "went out" as she was going down her client's stairs, causing her ankle to twist (R. 524). Her client caught her when she fell. Id. On January 31, 2012, Plaintiff had another x-ray of her left ankle as suggested by Dr. Strohl to check for fracture; Radiologist Terry Shank, M.D. observed that the tibiotalar joint was intact with no evidence of fracture seen (R. 527). However, the x-ray did note "mild spurring" and degenerative changes at the tarsal-metatarsal joints. Id.

Plaintiff was seen by Michael Shramowiat, M.D. at the Mountaineer Pain Relief and Rehabilitation Centers beginning on February 2, 2012, for electrodiagnostic studies of the left

lower extremity (R. 313). The studies were ordered pursuant to a recent left malleolar fracture and ongoing low back pain. Id. Results of an electromyography ("EMG") showed left tibial and peroneal neuropathy. Id. Dr. Shramowiat's treatment plan included prescriptions for Norco and Flexeril, icing the affected areas, and a TENS unit. Id.

On March 6, 2012, a third x-ray of Plaintiff's left ankle showed mild soft tissue swelling (R. 533). Dr. Strobl recommended further evaluation of the persistent left ankle pain through a nuclear medicine bone scan, a CT, or an MRI. Id.

On April 12, 2012, Plaintiff returned complaining of neck and low back pain in the past month, as well as her ongoing chronic left lower extremity pain (R. 312). A physical examination revealed:

> On exam, the patient has painful cervical paravertebral region. Muscle tightness of the upper trapezius '"him have trigger points. There is some lower lumbar paravertebral and paraspinal muscle tlghtn1iss and tenderness. Upper extremity strength is *515*. Brachioradialis reflexes +2. Sensation is intact.
>
> On exam, right lower extremity strength is 5/5 and left is 4/5. There is pain at extension of the left knee. Pain to palpitation over the knee. She has slightly decreased flexion and extension of the knee. The patient has swelling over the medial and lateral aspect of the ankles on the lower foot. Slightly decreased in range of motion of the foot. There is tenderness [over the medial and lateral aspect of the ankle with some decreased range of motion]. She has two areas on the lateral and medial aspect of the lower extremity that has rashes. They are maculopapular and pruritic. LS nerve root distribution has paresthesias. Some laxity over the left knee to palpation and range of motion.
>
> ASSESSMENT:
> 1. Neck pain. 723.1
> 2. Low back pain. 724.2
> 3. Pain in limb. 729.5
> 4. Dermatitis, left lower extremity.

(R. 311-12). Dr. Shramowiat ordered a bilateral cervical paravertebral injection of Methyprednisolone and Lidocaine, and a spinal X-ray. Id. Plaintiff was also referred to an orthopedic specialist for an additional opinion as to her left knee and left lower tibia fracture. Id.

Plaintiff was to have a follow-up visit at Mountaineer Pain Relief in two months. Id. A fourth x-ray on April 17, 2012 was again relatively normal, and an MRI was again suggested (R. 537).

However, Plaintiff returned early on May 29, 2012, complaining of continued neck pain radiating to both shoulders and lower extremity pain (R. 309). Dr. Shramowiat noted that Plaintiff was seeing Dr. Krivchenia for the fracture, instability, and chronic pain. She had also reported "fall[ing] frequently, usually once daily," and had a large bruise on her chest from one such fall. Id. At this visit, Plaintiff had:

> [S]ome discomfort with range of motion of the cervical spine. There is bilateral occipital nerve tenderness. Tenderness and tightness of the upper trapezius muscles. Upper extremity strength is 5/5. Brachioradialis reflexes +2, Sensation grossly intact. Lower extremity strength is 5/5 on the right and 4/5 on the left. Pain with extension over the left knee. Palpable tenderness over the entire knee. No effusion. Pain with range of motion of the left ankle including a slight decrease in dorsiflexion and eversion. Palpable tenderness on the medial and lateral aspect of the left ankle. Decreased sensation 15 nerve root distribution on the left. Negative straight leg raise. Paresthesias on the right foot.
>
> The patient has a contusion on the right lateral lower rib cage region which is slightly tender to palpation.

Id. Dr. Shramowiat's assessment included neck pain, greater occipital neuralgia, limb pain, osteoarthritis of the knee, and history of left tibial fracture. Id. He ordered bilateral occipital nerve blocks containing Methylprednisolone and Lidocaine. At Plaintiff's next visit, on June 7, 2012, Dr. Shramowiat noted she had done well with the nerve blocks, but still experienced left leg and low back pain (R. 308).

On June 12, 2012, Plaintiff was seen by Dr. Edward McDonough at the WVU Department of Orthopaedics (R. 301). Dr. McDonough related the following history:

> [O]n October 12, 2010, she fell while at work with her knee flexed underneath her. She had no problems with her knee or ankle prior to this injury. According to the patient, she was diagnosed with a tibial plateau fracture, which went on to heal; however, she continued to have complaints of pain and, therefore, was provided with a corticosteroid injection, which did not provide any relief in her pain, not even temporarily. She was sent to physical therapy, was not really making any progress in that and then in approximately January of this year, she was walking when her knee buckled and she sustained an ankle fracture. She apparently has been in a Cam boot since then, as well as ambulating with a

postoperative knee brace. She continues to complain of buckling of her knee even with straight ahead walking as well as chronic pain in the knee, primarily around the anterior aspect of her knee. She utilizes a cane for ambulation. She has noticed some swelling. She reports her pain is constant. She also notices some numbness down her whole leg from her thigh down to her toes and this includes the anterior, medial, lateral, and posterior aspects of her leg. She takes hydrocodone 10/325 mg, Flexeril and Relafen for her leg with continued complaints. A lot of the pain in her ankle is located around the medial side of her ankle.

Id. A radiograph on her knee was essentially negative. Id. An MRI from Wetzel County Hospital dated November 8, 2010 reported findings consistent with a medial tibial plateau fracture. (R. 301-2). It further showed a subacute anterior cruciate ligament ("ACL") tear involving the proximal and substance fibers, and mild strain of the medial and lateral collateral ligaments (R. 302). Plaintiff also had a small Baker cyst "with rupture noted with joint effusion and chondromalacia of the medial compartment of the knee." Id. Dr. McDonough's assessment was left chronic ankle and knee pain. Id. His treatment plan recommended conservative treatment, noting Plaintiff's pain and numbness, and opined that he did not think surgery was an option for her. Id. Dr. McDonough recommended physical therapy and a different knee brace. Id.

**5. Medical History after July 7, 2012**

On August 2, 2012, Plaintiff was seen again at Mountaineer Pain Relief with continued complaints of left leg pain and occasional swelling in that limb (R. 307). Dr. Shramowiat performed another physical examination:

Left lower extremity 415. Right lower extremity strength is 5/5.
She has moderate effusion at the left knee. Pain at the end range of extension at the left knee. Joint line tenderness medially and laterally. Mild edema in the right lower extremity. Pain with palpation in the calf and ankle but Homan's negative. The patient has moderate muscle tightness in the lumbar paravertebral region.
ASSESSMENT:
I. Osteoarthritis of the knee. 715.36
2. Low back pain. 724.2
3. Pain in limb. 729.5

Id. On September 4, 2012, she returned to Mountaineer Pain Relief reporting "constant left lower extremity pain, worst just above left knee and diffuse pain throughout entire left ankle," and that her "medication regimen decreases pain to an acceptable level." (R. 305). Her gait was antalgic, even with the knee ankle foot orthosis (KAFO) ambulatory aide in place, and there was "notable atrophy throughout left lower extremity." Id. Dr. Shramowiat referred Plaintiff for physical therapy three times per week, for four weeks. Id. Plaintiff was also to have two MRIs, one on her lumbar spine and one on her left knee, as well as an EMG on her left knee, which was covered by Worker's Compensation (R. 306).

On September 13, 2012, results of the EMG showed "slowed left tibial and motor conduction velocity" and "a left tibial neuropathy," relevant to ongoing pain and numbness in her left leg and foot (R. 304, R. 318-21).

On September 18, 2012, Plaintiff had the two MRIs conducted at Sistersville General Hospital (R. 314). The report of the spinal MRI, signed by radiologist Terry Shank, M.D., identified mild thinning of the intervertebral disc spaces throughout the lumbar spine and mild facet hypertrophy at L4-5 and L5-S1. The report of the left knee MRI, signed by radiologist Bernard Garrett, D.O., observed that ligaments, cartilage, and tendons appeared intact (R. 315). No altered signal was seen in the bone barrow, but some altered signal was observed in the subchondral and posterior aspect of the femoral condyle. Id. Radiologist Garrett opined this was most likely due to degenerative change or possibly old injury. Id. A small amount of fluid was observed in the suprapatellar bursa and joint capsule. Id.

On September 27, 2012, Dr. Shramowiat reviewed an MRI of Plaintiff's left knee dated September 18, 2012 (R. 303). A physical examination revealed "severe joint pain medially and laterally at the left knee, pain at the end range of extension, moderate effusion at the left knee,

[and . . .] mild atrophy in the left calf from disuse." Id. At this visit, Dr. Shramowiat injected Plaintiff's left knee joint again with Methylprednisolone and Lidocaine. Id.

On November 1, 2012, Plaintiff returned for a follow-up, reporting neck pain and tightness (R. 440). She reported that the injections she has received and the medications she takes decrease the severity. Id. A physical examination was normal, with the exception of mild restrictions on the cervical range of motion. Id. Dr. Shramowiat's assessment was neck pain pursuant to trapezius muscle spasms. Id. She was again given another Methylprednisolone and Lidocaine injection. Id. At this same visit, Dr. Shramowiat also addressed her ongoing constant left lower extremity pain, with Plaintiff reporting "constant pain at the knee with shooting type pain as pointed to throughout tibialis anterior region as well as diffuse pain throughout entire left ankle" (R. 439). She also reported instability of her left lower leg and related falls that happen when she does not wear her brace. Id. At her next appointment on January 2, 2013, nothing had changed (R. 438).

By February 27, 2013, Plaintiff reported her left leg pain was increasing in frequency and severity, and medications that used to work reasonably well now only "intermittently" decreased pain to an acceptable level (R. 437). She inquired about surgery, but the most recent assessment a year ago indicated she was not a candidate for surgery. Id. Her gait was antalgic; Dr. Shramowiat observed decreased left knee strength, diffuse tenderness of the left knee, and mild restrictions with knee flexion an extension. Id. Dr. Shramowiat referred Plaintiff to an orthopedic surgeon; she was awaiting authorization for physical therapy at that time. Id.

At her next appointment on April 25, 2013, her leg pain and instability remained unchanged; she again reported daily pain that worsened with weight-bearing activities, and worsened at night (R. 436). The referrals and authorizations Dr. Shramowiat requested were

denied by Workers' Compensation on April 2, 2013, because Plaintiff was "at maximum medical improvement with no need for further treatment." Id. Upon physical examination, her gait was still antalgic, she still had tenderness throughout left knee down to her left ankle, and her left leg strength was decreased still at her hip and knee. Id. Dr. Shramowiat noted Plaintiff was continuing to work with an attorney to get her injuries and treatment addressed. Id.

On June 25, 2013, Plaintiff returned to Mountaineer Pain Relief still complaining of chronic neck pain that radiated between her shoulders and was worse on the left; she also reported stiffness and crepitus in her spine (R. 428). A physical examination revealed decreased cervical range of motion, cervical paravertebral tenderness, and moderate bilateral trapezius muscle tightness and tenderness. Id. Methylprenisolone and Lidocaine injections were again administered. Id.

Plaintiff returned again on October 22, 2013 after her knee gave out on her, causing her to fall and hit her head on the linoleum floor, resulting in headaches, increased neck pain, and increased upper left arm pain (R. 425). Plaintiff reported headaches in the back of her head that radiate to the frontal region bilaterally, as well as dizziness and changes in vision (R. 423). Zomig, which used to alleviate her headaches, was not helping the headaches she had since her fall (R. 425). A physical examination revealed mild restrictions in cervical range of motion and moderate tenderness over the greater occipital nerves, as well as moderate tightness and tenderness of the trapezius muscle. Id. Dr. Shramowiat diagnosed cephalgia, status post fall; greater occipital neuralgia, neck pain, and left cervical radiculopathy, for which Plaintiff was given double her usual dose of injections. Id. Her problems with her left leg continued unabated from the last visit (R. 423). On November 5, 2013, results of a urine screen on October 22, 2013 – apparently done periodically for Plaintiff because she was prescribed strong narcotic pain

relievers – showed that she was taking her Hydrocodone but had not taken the Hydromorphone (R. 432). A note indicating that office personnel had notified Plaintiff to take her medications as prescribed was handwritten on this screen. Id. Subsequent screens showed that Plaintiff was consistently taking prescription-strength pain medications.

At next appointment on December 18, 2013, Plaintiff reported that her headaches had subsided, but her left knee pain and instability continued unabated (R. 422). A physical examination was essentially the same, with Plaintiff reporting discomfort throughout the range of motion testing. Id. On March 6, 2014, Plaintiff continued to complain of daily neck pain of varying intensity with intermittent pain radiating to her shoulders, moreso in her left shoulder (R. 420). Chronic left knee pain and instability continued unabated. Id. On May 5, 2014, Dr. Shramowiat observed that she had difficulty walking and could only walk short distances (R. 419). Moderate to severe muscle tightness in the thoracic paravertebral region and crepitus at the left knee were also present. Id. No changes were noted at her next visit on July 3, 2014 (R. 418).

On August 26, 2014, Dr. Shramowiat again noted constant and chronic low back and neck pain, osteoarthritis and pain in her left knee, and numbness in her left leg.  (R 417) She requested a referral to a surgeon for a consult. Id. An x-ray of Plaintiff's sacrum and coccyx, pursuant to "two falls recently with tailbone pain," showed no fractures but calcified pelvic phleboliths (R. 616). An x-ray dated September 14, 2012 of Plaintiff's right foot showed "abnormal appearance of the distal interphalangeal joint of the second digit;" showing a dislocated distal phalanx but no fracture (R. 618).

On October 14, 2014, Plaintiff was seen by Heidi Rusk, PA-C who reviewed x-rays of both knees and diagnosed osteoarthritis of the left knee, for which she received another injection (R. 637). Physical therapy for knee strengthening and conditioning was also recommended; the

provider told Plaintiff that "many of the symptoms going down the leg, and likely the leg weakness, is coming from her low back and not her knee." <u>Id</u>. Plaintiff's most recent documented visit to Dr. Shramowiat at Mountaineer Pain Relief was consistent with prior visits; Plaintiff continued to have constant and chronic low back pain, neck pain, and left knee pain (R. 639). Doctor Shramowiat also noted that Plaintiff saw Dr. Herriott the day prior; he gave her an injection in her knee, and was "going to try to hold on surgery on the left knee at this time" (presumably, "hold off on"). <u>Id</u>.

### 6. Medical Reports/Opinion

On November 14, 2012, results of a Ventilatory Function test showed a normal FEV1 but reduced FEV1/FVC ratio, leading to a diagnosis of "minimal obstructive airways disease – peripheral airway" (R. 324).

On February 20, 2013, Frank Bettoli, Ph.D. of Parkersburg Psychological Services conducted a consultative evaluation of the Plaintiff (R. 328). Dr. Bettolli noted that she walked with the assistance of her cane and wore a brace on her knee (R. 330). Plaintiff's appearance, attitude/behavior, demeanor, and mood were appropriate. <u>Id</u>. Plaintiff's thought process was "somewhat expansive and tangential," while her thought content was "generally relevant, though as times irrelevant and with excessive detail." <u>Id</u>. She has had suicidal thoughts in the past, though denied having them at present. <u>Id</u>. Immediate memory and recent memory was "mildly deficient," while remote memory was "fair" (R. 331). Although her persistence and pace were within normal limits, her concentration was poor. <u>Id</u>. Social functioning was within normal limits during the evaluation. <u>Id</u>. Outside the evaluation, Plaintiff reported spending time with a friend and sometimes with family; she enjoys spending time with her children and grandchildren. <u>Id</u>.

Dr. Bettoli diagnosed Major Depressive Disorder, recurrent, severe without psychotic features (R. 331). His diagnosis was based on "intermittent periods of acute depression lasting up to several weeks at a time," elaborating:

> These periods involve depressed and sad moods, anhedonia, decreased energy and social isolation, insomnia and decreased appetite, ruminative thinking, and suicidal ideation. There is no clear evidence of any mixed or manic episodes. Crucita did report that she sometimes hears indistinct voices of a male and a female or two children playing. It was not clear whether these occur exclusively within the course of a depressive episode.

Id. Dr. Bettoli also observed that Plaintiff "displayed some characteristics which may be indicative of an attention deficit disorder," elaborating:

> During the interview, she was impulsive and tangential, tended to interrupt, and had difficulty containing her verbal responses. She also did not do very well with the concentration portion of the Mental Status Examination. However, based upon this interviewer's current information, an additional diagnosis of ADHD was not merited.

Id. Dr. Bettoli believed Plaintiff was capable of managing her finances. Id.

## A. DIB at Initial Level

On February 25, 2013, Karl G. Hursey performed a review of mental and emotional factors only (R. 86). Reviewer Hursey found Plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning, moderate difficulties in maintainin concentration, persistence, or pace; and no repeated episodes of decompensation (R. 85). Sustained concentration and persistence limitations were moderately limited in ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, ability to interact appropriately with the general public, and ability to work in coordination with or in proximity to others without being distracted by them. (R. 89). Social interaction limitations were moderately limited in ability to interact appropriately with the general public, and ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Id. Reviewer Hursey found that "Claimant can manage

structured interactions with supervisors, co-workers, and the public in a non-adversarial environment." (R. 90) He observed that Plaintiff "shows some severe mental /emotional impairments that produce mild and moderate functional limitations; however Clmt retains the mental /emotional capacity to carry out simple, routine tasks within the limitations identified above and within any physical limitations that might be found." Id.

On November 21, 2012, Saima Noon found the following exertional limitations: occasionally lifting or carrying 25 pounds; frequently lifting or carrying 10 pounds; stand or walk for 6 hours in an 8 hour workday; sit for 6; unlimited pushing and pulling, excluding limitations for lifting and carrying. (R. 87). She opined Plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds (R. 87); and occasionally balance, stoop, kneel, crouch, and crawl (R. 88). Reviewer Noon found Plaintiff could perform past relevant work of "driver." Id. She posited environmental limitations of avoiding concentrated exposure to extreme cold, vibration, fumes, odors, dusts, gases, poor ventilation, machinery, and heights, with unlimited exposure to extreme heat, wetness, humidity, and noise. Id.

### B. DIB at Reconsideration Level

On September 5, 2013, Frank Roman, Ed.D. concurred with Reviewer Hursey, finding mild restriction of activities of daily living, as well as moderate difficulties in maintaining concentration, persistence, or pace, and moderate difficulties in maintaining social functioning. More specifically, the mental RFC detailed sustained concentration and persistence limitations in that Plaintiff was moderately limited in ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, and ability to work in coordination with or in proximity to others without being distracted by them. (R. 104).

As to Plaintiff's social interaction limitations, she was moderately limited in ability to interact appropriately with the general public, and ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes (R. 105).

On September 6, 2013, Ativa M. Lateef, M.D.'s physical RFC found medically determinable impairments that can be expected to produce pain or other symptoms, though statements about intensity, persistence, and functionally limiting effects of symptoms were not substantiated by OME alone (R. 101). Plaintiff was found partially credible, considering her adult function report and activities of daily living. Dr. Lateef found the following exertional limitations: occasionally lifting or carrying 25 pounds; frequently lifting or carrying 10 pounds; standing or walking for 4 hours in an 8 hour workday; siting for 6 hours; and unlimited pushing and pulling, excluding limitations for lifting and carrying. (R. 102-103). Dr. Lateef opined Plaintiff could occasionally climb ramps, stairs, but never climb ladders, ropes, or scaffolds; she could occasionally balance, stoop, kneel, crouch, and crawl (R. 103). Environmental limitations consisted of avoiding concentrated exposure to extreme cold, vibration, fumes, odors, dusts, gases, and poor ventilation, and avoiding all exposure to machinery and heights, with unlimited exposure to extreme heat, wetness, humidity, and noise. Id. Dr. Lateef found Plaintiff could perform "manager fast food service" as general performed in national economy (R. 107).

### C. Testimonial Evidence

Plaintiff testified as to her personal information at the administrative hearing on November 4, 2014. She was born on July 5, 1957, and was fifty-seven (57) years old at the time of the hearing (R. 64). She was currently married, and lived with her husband in Middlebourne, West Virginia. Id. She graduated from high school, her highest level of education. Id.

Plaintiff next testified as to her work history. She was employed by Mentor Management as an in-home aide to the mentally handicapped (R. 65). She was unable to continue in that work because she could not perform requirements such as going up and down steps and vacuuming. Id. She was employed in the latter part of 2012 by Cathy Parsons Consulting, where she escorted truck drivers for well companies (R. 66). She could not continue that work because it involved 1) long hours driving and she was not able to take occasional breaks from sitting because the drivers were on a schedule, and 2) driving a manual transmission which required frequent engagement of the clutch with her left leg, in which she has no feeling due to permanent nerve damage. Id. The issues with her leg were due to an on-the-job injury, and were covered at that time on a temporary basis by a worker's compensation plan and settlement (R. 67).

Plaintiff also attempted to find other work she could perform, considering restaurant work because she had enjoyed that type of work in the past (R. 67). However, concerns about having to lift heavy things, especially those that were hot off the stove, scared Plaintiff because she has had carpal tunnel surgery in both hands and her wrists were very weak. Id. She was worried about this because she had dropped even "small kettles" at home when trying to move them, and items in a commercial kitchen would be at least as heavy, or often, heavier. Id.

It was carpal tunnel in her wrists that also forced her to stop working in 2007 at another job, at Simonton Building Products, where she made sash:

> That's where I got carpal tunnel the last time and they said they could no longer let me work because, you know, the doctor refused to do the surgery because I would go straight back to there and it would redo it all over again. And he said that he would not do the surgery and Simonton's saying, well, we can't use you.

(R. 68). Plaintiff had tried to get a different position within Simonton that she would be able to perform, but Simonton did not grant her an interview even after she applied to be a phone operator there. Id. Prior to her employment with Simonton, Plaintiff had also worked at PPG

Cafeteria with the Compass Group, where she helped run the kitchen, and prepared and served food (R. 68-9).

Plaintiff next testified as to the problems and impairments she experienced with her leg:

Q:    [A]s far -- at what part of your leg do you not have any feeling in?
A:    I don't have it in the lower -- basically it's the whole leg but the, the one that hurts the worst is from the knee on down to my, my toes.
Q:    Well, when you say no feeling at all, I mean, that, that kind of give me the impression that when you stand up you can't feel your foot on the ground.
A:    . . .[T]otally honest with you, I barely feel it, if I feel it all. I have arthritis in there.
Q:    How are you able to walk on it then?
A:    Walk very carefully.
Q:    Do you have a cane?
A:    Yes, I do.
Q:    Did you bring it with you today?
A:    It's in the car. I was just parked across the road.

(R. 69). Representative for the Plaintiff then asked clarifying questions. Plaintiff elaborated that it was specifically leg and back pain that necessitated taking breaks in driving, which was problematic in her work for Parsons Consulting as a driver escort (R. 70). She does still drive, but has to drive an automatic, and has to take a ten-minute break if she drives for longer than one (1) hour (R. 71). She testified that her left leg gives her trouble when walking not just in terms of pain and numbness, but also "goes out" on her. Id. Her leg causes her to spend most of her day sitting. Id. She does what she can of housework and appointments she has to keep, but is limited. Id. In terms of housework, she can't vacuum or stand at the sink to do dishes. Id. To compensate, she had to buy a dishwasher. Id.

Her job as an in-home aide required her to do the kinds of household activities that she has difficulty with, because it was her job to help her clients with dishes, laundry, sweeping, and mopping (R. 72). She wears a leg brace which she puts on first thing in the morning and takes off before going to bed. Id.

Later in the hearing, the ALJ further inquired of Plaintiff as to her prior work as an order clerk. Plaintiff was employed on a seasonal basis by Cabela's, from August through December of 2004 and 2005 to assist with duck season and the Christmas season (R. 74). Plaintiff also clarified that she worked at the pizza restaurant for about five months when she had to leave because her husband had triple bypass surgery and she could not manage both work and caring for him (R. 75).

### D. Vocational Evidence

Ms. Patricia McFann, an impartial vocational expert ("VE"), also testified at Plaintiff's administrative hearing. The VE testified that Plaintiff's work as a mental retardation aide is light and semiskilled with a Specific Vocational Preparation ("SVP"): 3 (R. 73). The VE also noted that Plaintiff did a lot of sitting in her last assignment, but that "you can't always get the job as a companion and just be seated all the time" (R. 73-4). Plaintiff's previous work as an assistant manager for a pizza business is light and skilled with an SVP: 5 (R. 74). Plaintiff's previous work as a cafeteria cook and worker is medium and skilled, with an SVP: 6. Id. Plaintiffs previous work as a sash fabricator in the window industry is medium and skilled, with an SVP: 5. Id. Plaintiff's previous work as an order clerk is light and semiskilled with an SVP: 3. Id.

The ALJ then asked the VE the following hypothetical:

> All right. Let's assume a person of the claimant's age, education, and work background. Such a person is limited to light work as defined in the regulations. They should avoid ropes, ladders, or scaffolds. They can climb ramps and stairs only occasionally and perform other postural activities only frequently. There should be no work at unprotected heights, no concentrated exposure to dust, fumes, gases, poor ventilation, noxious odors, (INAUDIBLE) inertants, no concentrated exposure extremes of cold or to vibrations. I'm sorry. Let's modify that a little bit with the postural activities and limit only to no, no crawling there, no crawling, ropes, ladders, or scaffolds, occasional ramps, stairs, and (INAUDIBLE). HA: I can't understand you, Judge. I'm sorry.
> Q I'm too far away from the mic. I'm modifying the -- what I earlier said in the hypothetical to be no ropes, ladders, scaffolds, also, no crawling, occasional ramps and

stairs and other postural activities only frequently. Is such a person able to perform the claimant's past work?

(R. 76). The VE opined that such an individual would be able to employed as a companion, which is light and semiskilled with an SVP of 3, and also as an order clerk, which is light and semiskilled. Id. The ALJ then added a limitation to this hypothetical: if the individual should have no more than occasional forceful gripping or twisting with either hand, and no more than frequent handling and fingering with either hand. The VE testified that both jobs would still be feasible, and that there would be no skills that would transfer from those jobs into sedentary with the same restrictions (R. 77).

Plaintiff's counsel then inquired of the ALJ, based on Exhibits 5F and 11F, if that hypothetical individual could not tolerate constant contact with others and was reduced to only frequent contact with others, if companion work would still be feasible (R. 77). The VE stated that it would; however, less than frequent contact with others would eliminate companion work. Id. Counsel then revised the hypothetical posed to the VE:

> ATTY: Okay. Ms. McFann, I also want to look at the same hypothetical I just gave you but I want to remove the socials. So go back to -- reset to the -- where we just were. The limitation regarding handling and fingering, that was less than frequent. If that was occasional, would that still allow for those light level jobs?
> VE: Not, not the jobs identified, no.

Id. That concluded the administrative hearing.

### E. Work History Reports and Pain Questionnaires

### 1. Work History Report

On October 13, 2012, Plaintiff completed a work history report with the help of her husband, Earl. From 1986 to 2001, she worked in food service; (R. 218). From 2001 to 2006, she worked for Simonton Windows as a sash fabricator. Id. In this position, she walked, stood, sat, handled large and small objects, and reached all day (R. 223). She frequently llisted ten (10)

pounds, and lifted as much as twenty (20) pounds at times. Id. From 2006 to 2007, she worked

for Defelice's Pizza as an assistant manager (R. 221). Per day, she walked, stood, kneeled,

reached, grasped, wrote and handled small objects for eight (8) hours; she sat for one (1) hour.

Id. She lifted less than ten (10) pounds frequently, but lifted as much as twenty (20) pounds at

times. Id. In this position, she supervised, hired, and fired employees. Id. From 2007 to 2012, she

worked for REM in assisted living three days per week, supervising mentally challenged persons

and sitting for ten (10) to twelve (12) hours per day (R. 220).  In July 2012, she drove an escort

vehicle, which required her to sit for twelve (12) hours a day (R. 219). On July 22, 2013.

Plaintiff completed a second Work History Report that was essentially consistent with her

previous Work History Report (R. 269).

### 2.  Pain Questionnaire

On October 13, 2012, Plaintiff completed a Pain Questionnaire with the help of her

husband, Earl. (R. 230). Plaintiff reported constant pain in her back, knee, ankle and hip, and

described it as aching, stabbing, burning, stinging, cramping, and throbbing (R. 226). The pain

she experienced was frequently a "10+" on a scale of 1-10, was worsened by changing weather

and physical activity. Id. She began taking Hydrocodone and Flexeril, which would relieve the

pain only some of the time (R. 227). Side effects of these medications included an inability to

stay awake and function normally. Id.

On July 22, 2013. Plaintiff completed a second Pain Questionnaire that was essentially

consistent with her previous Pain Questionnaire, with the addition of neck and hand pain (R.

248).

### F.  Lifestyle Evidence

### 1.  Adult Function Report

On October 13, 2012, Plaintiff completed an Adult Function Report. In the Report, Plaintiff stated that her knee and ankle give out without warning; she also has severe depression, COPD, and an immune deficiency (R. 211). As for her daily activities, Plaintiff reported watching TV and trying to do housework "as [she] can" (R. 212). She reported taking care of meals and clothing, while her husband has to wash dishes and helps with clothing. <u>Id</u>. Plaintiff and her husband jointly care for their pets. <u>Id</u>. Before her medical issues, she was able to do almost anything she wished to, which is no longer the case. <u>Id</u>. Her sleep is affected by sleep apnea. <u>Id</u>.

As to personal care, Plaintiff reported that she is able to feed herself without difficulty. However, she has difficulties getting dressed, and must sit down in order to dress herself. <u>Id</u>. Her leg prevents her from bathing as often as she needs to, and causes difficulty getting to, and up from, the toilet. <u>Id</u>. Plaintiff cannot vacuum, mop, or do any yard work due to her leg. (R. 213). Plaintiff checked "No" to the question "When going out, can you go out alone?" but clarified that "usually, [her] daughter in law will go with [her]." <u>Id</u>.  She is able to drive, and shops for groceries once a week. <u>Id</u>. Although she can count change and write checks, Plaintiff reported difficulty keeping bills in order and balancing a checkbook, which has caused her to overdraw her account. <u>Id</u>.

Plaintiff's hobbies include watching television and making jewelry, which she does daily (R. 214). She used to do things with her husband that she can no longer do, such as hunting, riding ATVs, watching NASCAR races, and shopping. <u>Id</u>.

As to social activities, Plaintiff reports that she does not spend time with others and does not go places on a regular basis (R. 214). She needs to be reminded of doctor's appointments. <u>Id</u>. She argues with her husband due to her depression, and no longer socializes (R. 215).

Plaintiff reports that her conditions affect her ability to stand, sit, walk, kneel, squat, bend, lift, reach, climb stairs, and talk (R. 215). Her memory, concentration, and understanding, as well as her ability to concentrate, follow instructions, and get along with others are also affected. Id. She cannot lift her grandchildren or walk 100 yards without stopping to rest for at least five minutes before resuming. Id. She can pay attention "maybe 10 or ten minutes," has trouble finishing what she starts, and gets confused with both written and spoken instructions. Id.

Plaintiff gets along "fine" with authority figures, but reports being fired or laid off from a job because of problems getting along with an employee who called her names (R. 216). She does not handle stress well, but fares better with changes in her routine. Id. She reports hearing voices and noises when home alone. Id.

Plaintiff has used crutches, a walker, and a wheelchair in the past, but not presently; now, she uses a cane and a brace on her leg daily (R. 216). Her current medications included Hydrocodone for pain and Trazodone, both of which have side effects (R. 217). Plaintiff reported that the Hydrocodone makes her extremely sleepy and irritable, while the Trazodone makes her fight sleep. Id.

On July 22, 2013. Plaintiff completed a second Adult Function Report which was mostly consistent with her previous Adult Function Report with a few additions (R. 253). She was having difficulty sleeping and reported numbness in her feet. Id. She cut her hair short to make it easier to manage, reported having trouble shaving her legs, needing help getting dressed on occasion, and being unable to feed herself or use the toilet without help. Id. She wrote that her husband now paid the bills because she could not concentrate (R. 266). Plaintiff reported being afraid that she would die in her sleep, which caused her to fight sleep (R. 267). As to abilities, "is

hard lift or anything else due to leg going numb or tingling Has caused me to fall cannot concentrate due to pain" [sic] (R. 266). She could not recall her medications. (R. 268).

An attached Patient Profile Report from Phillips Pharmacy shows medications prescribed to Plaintiff in April and May 9, 2013, included Hydrocodone, Cyclobenzaprine, Celebrex, Fluoxetine, Spiriva, Ranitidine, Spironolactone, Trazodone, Metoprolol, Simvastatin, Proair, Clonazepam, Losartan, Zomig, and Advair (R. 277). This was largely consistent with Claimant's Medications form, which included Hydrocodone and Cyclobenzaprine for pain; Spiriva, Qvar, and Proair for COPD; Ranitidine for heartburn; Metoprolol, Spironolactone, and Losartan Potassium for blood pressure, Patroprazole for acid reflux, Klonopin for anxiety, Trazodone for sleep, Simvastatin for cholesterol, Fluoxetine for depression, and Potassium (R. 293-4).

### III. THE FIVE STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2004). The Social Security Administration uses the following five-step sequential evaluation process to determine whether a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment

24

that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the [RFC] of the claimant is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2015); 20 C.F.R. § 416.920 (2012). In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once this is proven, the burden of proof shifts to the Government during step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled at any of the five steps, the process will not proceed to the next step. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

## IV.    THE ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2. The claimant has not engaged in substantial gainful activity since July 7, 2012, the alleged onset date (20 CF'R 404.1571 *et seq.*).

3. The claimant has the following severe impairments: obesity, degenerative disc disease of the lumbar spine, status-post left tibia fracture with left tibial neuropathy, chronic obstructive pulmonary disease (COPD), and carpal tunnel syndrome status-post release (20 CF'R 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she must avoid ropes, ladders, and scaffolds. She could climb ropes and scaffolds occasionally and could perform all other postural activities frequently. She could not work around unprotected heights. She must avoid concentrated exposure to dusts, fumes, gases, and poor ventilation. She must avoid concentrated exposure to vibrations and extremes of cold. She could not perform crawling. She could perform no more than occasional forceful gripping or twisting of the bilateral upper extremities, and no more than frequent fingering and handling with the bilateral upper extremities.

6. The claimant is capable of performing past relevant work as a companion and an order clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from July 7, 2012, through the date of this decision (20 CFR 404.1520(1)). (R. 45-53).

## V. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated

that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff argues in her Memorandum of Support of her Motion for Judgment on the Pleadings that:

1. The ALJ's finding Ms. Kendle's mental impairment to be a non-severe impairment is not supported by substantial evidence.

2. The ALJ failed to comply with 20 C.F.R. § 404.1527 in evaluating the medical opinions of record.

3. The ALJ's pain analysis and credibility findings were not in compliance with regulatory and case law.

(ECF No. 13). The Commissioner contends:

1. Substantial evidence supports the ALJ's conclusion that Plaintiff's mental impairments did not significantly limit her ability to perform basic work activities, and therefore were not severe.

2. Substantial evidence supports the ALJ's evaluation of the medical opinion evidence.

3. Substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were only partially credible (ECF No. 16-1).

### C. Issue of Medical Opinion (Weight)

20 C.F.R. § 404.1527 defines a "medical opinion" as "statements from physicians or psychologists . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical and mental restrictions." Here, there are numerous medical opinions in the record. Plaintiff's pain specialist, Dr. Shamrowiat, is a treating physician due to his longitudinal and frequent treatment of Plaintiff over the past few years. The record includes his treatment records, but does not contain a specific opinion as to disability from Dr. Shamrowiat with regard to Plaintiff's limitations or ability to work. However, to the extent that his records reflect opinions as to nature and severity, symptoms, diagnosis, and treatment, those opinions are from a treating physician and must be analyzed as such. The same is true for Dr. Nichols, though not a specialist. The regulations, specifically 20 C.F.R. § 404.1527(c), discuss how the ALJ weighs treating source medical opinions:

> *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion:
>
>> (1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>>
>> (2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and

severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> (i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

> > (ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability*. The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting

explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization*. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors*. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it. See Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Such opinions should be accorded great weight because they "reflect[] an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983). In Craig v. Chater, however, the Fourth Circuit further elaborated on this rule:

Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques

> and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

> By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

76 F.3d 585, 590 (4th Cir. 1996). In addition, "[n]either the opinion of a treating physician nor the determination of another governmental entity are binding on the Secretary." DeLoatch v. Heckler, 715 F.2d 148, 150 n.1 (4th Cir. 1983). Thus, "[t]he treating physician rule is not absolute." See Hines v. Barnhart, 453 F.3d 559, 563 n.2 (4th Cir. 2006).

The Fourth Circuit has also noted that a court "cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). An ALJ's failure to do this "approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977) (quoting Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974)). Here, the ALJ's opinion lacks the proper weight analysis for Plaintiff's treating physicians, as explained below.

1. **Medical Opinions**

Because Dr. Shramowiat is a treating physician, the ALJ was required to explain how much weight was afforded to his opinion and why, reviewing the relevant factors, which he did not sufficiently do. Apart from a general conclusion that the medical evidence was, in the ALJ's lay opinion, "weak," – which as discussed in more detail below, the undersigned finds unsupported by substantial evidence – his documented longitudinal opinions about the nature and

severity of Plaintiff's issues, especially with her left leg and accompanying pain, as well as his diagnosis, were not analyzed and weighed according to the appropriate legal standard.

## 2. Psychological Opinions

The record contained three psychological opinions: two from state agency reviewers Karl G. Hursey, M.D., and Frank Roman, Ed.D., and one Consultative Evaluation opinion from Frank Bettoli, Ph.D. As to the agency reviewers, the ALJ stated in his opinion that:

> The undersigned has considered the findings of State agency consultants Karl G. Hursey, M.D., and Frank Roman, Ed.D. (Exhibits IA and 3A), who found the claimant to have moderate limitations in social functioning and concentration, persistence and pace, but noted the claimant had the mental and emotional capacity to carry out simple, routine tasks (Exhibits 1A and 3A).
> These findings are afforded some weight. While the doctors retain significant program knowledge and an expertise in mental health, evaluations of "moderate" limitations are simply not supported by the medical evidence of record.

### A. Daily activities

Limitations in Plaintiff's daily activities were found to be mild by reviewers Hursey and Roman. The only evidence cited by the reviewers relevant to credibility was that "[Plaintiff] is able to leave home when needed, for example to manage shopping or appointments. AFR states does not go out alone but drove herself to CE." In the absence of any other cited evidence, this appears to be the sole basis for finding Plaintiff partially credible in terms of mental symptoms, and in part supports finding mild – as opposed to any greater - limitations in daily activities on mental (not physical) grounds. (R. 85, 101). Dr. Bettoli was unable to address daily activities with Plaintiff due to time constraints (R. 331), leaving the state agency reviewers' opinions of mild limitations undisputed by any other professional opinion.

## B.  Sustained concentration and persistence limitations

Dr. Bettoli found Plaintiff's persistence and pace to be within normal limits, but found concentration to be poor. Reviewers Hursey and Roman, who both reviewed Dr. Bettoli's consultative examination report, concurred that Plaintiff was "moderately limited in ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, ability interact appropriately with the general public, and ability to work in coordination with or in proximity to others without being distracted by them (R. 89; R. 104). Reviewer Hursey cited to specific evidence to support the cognitive findings, noting that Plaintiff has "relatively frequent functional difficulties [due to] cognitive problems," her concentration was "notably poor" at the consultative examination, and she "may have difficulty with routine tasks from time to time [due to] memory problems" (R. 86). Dr. Roman affirmed these findings (R. 101).

## C.  Social interaction limitations

Dr. Bettoli conducted a consultative examination and diagnosed "Major depressive disorder, recurrent, severe, without psychotic features" (R. 331). His diagnosis was based on "intermittent periods of acute depression lasting up to several weeks at a time," involving "depressed and sad moods, anhedonia, decreased energy and social isolation, insomnia and decreased appetite, ruminative thinking, and suicidal ideation." Id. He also observed that Plaintiff "displayed some characteristics which may be indicative of an attention deficit disorder," including being "impulsive and tangential," interrupting, and having difficulty containing her verbal responses; but he could not make a diagnosis of ADHD based upon his current information. Id. Plaintiff also performed poorly on the concentration portion of the mental status examination. Id. Dr. Bettoli's prognosis was as follows:

Regarding her mental and emotional functioning, Crucita does have periods of significant depression which would reasonably interfere with her ability to attend work and also to perform appropriately if she were in attendance. She has managed to benefit in the past from psychotherapy and was strongly encouraged to do so. She may make additional improvements by doing so. By her report, she has in recent months been utilizing a combination of medications, which help her in managing her depression effectively.

(R. 332). Reviewers Hursey and Roman considered Dr. Bettoli's consultative examination report findings on social limitations, and both agreed that Plaintiff was "moderately limited in her ability to interact appropriately with the general public, and in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes" (R. 89). Reviewer Hursey cited to specific evidence to support the social findings, noting that Plaintiff "struggles to manage basic social interactions or relationships effectively," she is "impulsive, tangential, to interrupt [sic], and had difficulty containing her verbal responses, all of which suggest clear difficulties in social pragmatics and social interaction" (R. 85). Dr. Roman affirmed these findings (R. 101).

All three psychological reviewers/examiners thus agree in the assessment of moderate cognitive limitations. The two agency reviewers agreed that there were mild limitations in daily activities; Dr. Bettoli did not address this, leaving theirs as the only two professional opinions on the subject. As to social functioning, Dr. Bettoli concluded this was within normal limits based on Plaintiff's self-reports of her interactions with only those few individuals closest to her - her best friend, and her father, children, and grandchildren (R. 331). However, reviewers Hursey and Roman, taking this into consideration with the record as a whole, found moderate limitations in social functioning because, beyond how well she is able to interact with only those closest to her, Plaintiff was "moderately limited in ability to interact appropriately with the *general public*, and ability to get along with *coworkers or peers* without distracting them or exhibiting behavioral extremes" (R. 89) (emphasis added). Further, Liz Harshberger with Crittendon Services also

found that Plaintiff had "moderate symptoms or moderate difficulty in social impairment, occupational, or social functioning" (R. 475). Thus, three out of four mental health specialists found that Plaintiff had moderate limitations in social functioning. The one who found social functioning to be within normal limits, Dr. Bettoli, based that finding on only a few of Plaintiff's closest and best relationships; it was not based on her interactions in general. Under these circumstances, and the record as a whole, the undersigned can find no substantial evidence to support the ALJ's decision to dismiss those opinions in favor of his own.

The ALJ stated that Plaintiff "does well with authority figures and has never been fired or laid off from a job for problems getting along with others (Exhibits 1 lE and 12E)" (R. 46). In actuality, Plaintiff did report being fired or laid off from a job for problems getting along with others – an "employee calling me names I did not like" in her Adult Function Report (AFR) on October 13, 2012 (R. 216). Plaintiff apparently completed two subsequent AFRs, both of which were dated on the same day - July 22, 2013 – and answered "no" to this question (R. 259, R. 267). However, given the ALJ's failure to inquire of Plaintiff at the hearing as to the discrepancy, or any discernible attempt to reconcile whether this was due to simple oversight or difficulties in filling out forms – as Plaintiff's poor concentration is well established by the record – this conclusion also cannot be supported by substantial evidence.

The ALJ opined that the record did not support more than mild mental limitations because 1) Plaintiff had no "longitudinal history of mental health treatment," and 2) her mental status at the consultative examination was "relatively normal" (R. 47). However, though it is true that Plaintiff had no longitudinal treatment from a mental health *professional*, the record clearly shows that she does indeed have a longitudinal history of mental health *treatment* for her depression, which is well documented. She has been prescribed a variety of antidepressants for

years, and on occasion, her antidepressant medications were changed or adjusted when her current regimen was not helping (R. 356). As to her mental status at the consultative examination, it is unclear from the ALJ's opinion how her mood and appearance on one particular day outweighs a record full of medical evidence to support her ongoing major depressive disorder. As such, this too is not supported by substantial evidence.

In summary, none of the three psychological opinions are required to be afforded controlling weight, since none of them are treating psychologists. Dr. Nichols did treat Plaintiff longitudinally for depression and prescribed her medications, but he is not a specialist or psychologist, so he also is not required to be afforded controlling weight.

However, "while an ALJ may not reject medical evidence for no reason or for the wrong reason, see King v. Califano, 615 F.2d 1018, 1020 (4th Cir.1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings." Ratliff v. Barnhart, 580 F. Supp. 2d 504, 514 (W.D. Va. 2006). The ALJ states that the agency reviewers have "significant program knowledge and an expertise in mental health," but then went on to say that "evaluations of 'moderate' limitations simply are not supported by the medical evidence of record" (R. 47). It is also worth noting that although Dr. Nichols is indeed not a mental health specialist, which the ALJ cites as supportive, Dr. Nichols' diagnosis of Plaintiff's emotional problems, for which he prescribed her antidepressants, was *confirmed by every other expert psychological opinion in the record*.

An ALJ may not cross "the line between considering the evidence of record and 'playing doctor' by drawing his own medical conclusions about [a plaintiff's] . . . impairments." Forquer v. Commissioner of Social Security, No. 1:15CV57, 19 (N.D. W.Va. 2015), citing Frank v.

Barnhart, 326 F.3d 618, 621-22 (5th Cir. 2003) (noting that ALJ impermissibly made his own independent medical assessments by drawing his own medical conclusions from medical evidence of record). When all four psychological opinions in the record, even those of agency reviewers and consultative examiners – who have no relationship with the Plaintiff and thus, unlike a treating source with an established relationship, no possible motivation to assist a finding of disability – are largely in agreement and are not inconsistent with each other, as explained, an ALJ may not disregard them all in favor of his own assessment without substantial evidence for doing so, and without support from the record, none of which are satisfied here.

### D. Credibility Determination of Plaintiff's Subjective Complaints

The determination of whether a person is disabled by pain or other symptoms is a two-step process. See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1); SSR 96–7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment[2] capable of causing the degree and type of pain alleged. See Craig, 76 F.3d at 594. Second, once this threshold determination has been made, the ALJ considers the credibility of the subjective allegations in light of the entire record. Id.

Social Security Ruling 96–7p sets out some of the factors used to assess the credibility of an individual's subjective symptoms, including allegations of pain, which include:

> 1. The individual's daily activities; 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. Factors that precipitate and aggravate the symptoms; 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other

---

[2] Step one is fulfilled here. The ALJ in his decision stated that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . ." (R. 49). Thus, the Court addresses only Step Two.

symptoms; 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96–7p, 1996 WL 374186, at *3 (July 2, 1996).

There are a number of troubling aspects of the ALJ's rationale with regard to Plaintiff's subjective complaints of pain and credibility. As to the first factor, the ALJ's daily activity analysis largely consisted of mere skepticism:

> Although the claimant has described daily activities, which are fairly limited, testifying to doing very little throughout the day, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision.

(R. 51). What the ALJ meant exactly by "cannot be objectively verified with any reasonable degree of certainty" is not completely clear; further, how an ALJ would "verify" a plaintiff's daily activities is equally unclear. The ALJ appears to admit that Plaintiff's daily activities are quite limited, but simply declines to believe that they are in fact so limited – or, in the alternative, that the reason they are so limited is unrelated to her medical conditions. The ALJ does not elaborate as to what "other reasons" he suspects might be limiting Plaintiff's daily activities, nor does he cite to any specific evidence to support this theory, apart from a brief, general observation that the medical evidence was "weak." However, it is unclear how the ALJ determined that Plaintiff *did* have medical conditions that could reasonably be expected to cause the symptoms alleged, but at the same time, that the medical evidence was so weak as to discredit the symptoms alleged.

The Commissioner does not argue, nor is there any requirement, that a plaintiff's daily activities must be "objectively verified" by the ALJ – though it is still unclear what the ALJ meant by that statement – in order to be deemed credible. Once a plaintiff has testified as to what daily activities she does engage in, she is not required to then also prove to an ALJ that she does not do more. Rather, a correct statement of the law is that an ALJ may find that a plaintiff's subjective complaints of pain are less credible *if* the plaintiff's daily activities *contradict, or do not support,* those subjective complaints. Here, they do not, as the ALJ concedes.

As to the second factor, The ALJ stated that Plaintiff's claim that she is "constantly" in severe pain is "so extreme as to appear implausible." The ALJ appears to so conclude because she has not "providing convincing details regarding factors which precipitate the allegedly disabling symptoms," the third factor to be evaluated (R. 51). However, at numerous points in the record, she indicated that weight-bearing activity (R. 436, R. 636), physical activity (R. 84, R. 100, R. 243, R. 248), and changes in the weather (R. 84) makes her pain worse, and ice and medications help (R. 100). It is unclear from the ALJ's opinion why he finds those details unconvincing, apart from mere skepticism. As such, it cannot be found to be supported by substantial evidence, and further is contradicted by the evidence of record.

As to the fourth factor, the record reveals that Plaintiff has been taking strong prescription medications daily for the past few years for the pain she experiences. The medications a claimant takes is evidence relevant to a credibility determination regarding allegations of pain. <u>Kearse</u>, 73 Fed. Appx. at *603[3] (taking only over-the-counter medications such as Tylenol and Motrin for pain supported finding that pain was not as severe as claimant

---

[3] "In reaching his credibility determination, The ALJ found that although Kearse suffered from impairments that could cause some of the alleged symptoms, the objective medical evidence did not support the alleged severity. An extensive analysis of the objective medical evidence revealed that Kearse did not begin to complain of headaches

alleged). Taking only mild pain relievers, in absence of objective medical evidence to support allegations of pain, and in conjunction with daily activities that contradict those allegations, does not support a finding of disability. <u>Shively v. Heckler</u>, 739 F.2d 987, 989-90 (4th Cir. 1984) (Extra strength Tylenol and extra strength Excedrin, and a prescription analgesic intended for mild to moderate pain, did not sustain pain allegations alone without supporting objective medical evidence).

Plaintiff's ongoing and frequent visits to Dr. Shramowiat at the Mountaineer Pain clinic are well documented, and she took hydrocodone and hydropmorphone up to *five times per day* to try to manage her pain (R. 441, R. 277). Hydrocodone is a prescription-strength Schedule II controlled substance and opioid pain medication designed to treat severe pain.[4] The ALJ did not address this directly, relying primarily instead on his own determination that the medical evidence was "weak," and mere skepticism of Plaintiff's subjective complaints of pain. Thus, this factor was largely ignored. To the extent that the ALJ implies Plaintiff is simply malingering, the undersigned finds that there is no substantial evidence to support that conclusion. The record demonstrates that Plaintiff's left leg consistently demonstrated slightly decreased strength than her right, and there was some atrophy of her left leg. Further, in his opinion, the ALJ explicitly recognized that "some mild atrophy about the left leg and some reduced strength in that leg, characterized as a 4/5, is documented in the record," and that "motor loss (atrophy with associated muscle weakness)" is a factor to consider (R. 48). This objective medical evidence demonstrates that Plaintiff is not using her left leg as much as her right, and supports her subjective complaints of pain as the reason.

---

[4] Zohydro ER (hydrocodone bitartrate) – Drug Summary. Retrieved October 25, 2016 from Physicians' Desk Reference Online (PDR.net): http://www.pdr.net/drug-summary/Zohydro-ER-hydrocodone-bitartrate-3389.4565

The Commissioner argues in support of the ALJ's skepticism by noting that Plaintiff did not bring her cane inside to the hearing (R. 69). This is unpersuasive for a number of reasons. First, Plaintiff must wear a brace on her left leg in order to help stabilize her knee and reduce falls, which she testified to wearing daily, and has been documented as wearing at many points throughout the record to numerous doctor appointments. The fact that she did not also use her cane *in addition to* wearing her knee brace to walk a very short distance from her car, "just parked across the road" from the hearing, is neither substantial evidence of anything, nor persuasive (R.69), especially in light of Plaintiff's left knee instability and resulting falls which are well documented in the record.

As to the fifth factor, the ALJ recognized that in Plaintiff's left leg and knee, objective medical evidence identified 1) a medial tibial plateau fracture, 2) atrophy near the calf, 3) decreased strength, 4) tibial neuropathy, and 5) osteoarthritis (R. 50). He also found that Plaintiff's numerous identified left leg issues and impairments "could reasonably be expected to cause the alleged symptoms" (R. 49).

However, the ALJ then discounted one of those findings, the medial tibial plateau fracture because "Orthopedist Barry McDonough, M.D., found no need for invasive measures, finding conservative therapy to be the best option" (R. 50). That is at best an incomplete characterization of Dr. McDonough's statement, and at worst, simply inaccurate. In fact, the entirety of what Dr. McDonough actually noted was that "There is some irregularity seen on the MRI with her ACL; however, *with her complaints of pain and numbness*, we think the best option for her would be conservative treatment" (R. 302) (emphasis added). It is clear to the undersigned that Dr. McDonough recommended conservative treatment not because he saw no need or medical basis for more, but because, in light of the totality of Plaintiff's problems and

condition, he was hesitant to do more. Further, Dr. McDonough was not the only medical provider in the record to have reached this conclusion. Dr. Herriott was also considering surgery on Plaintiff's left knee, but as of October 2014, was "going to try to hold [off] on surgery on the left knee at this time" (R. 637).

The undersigned can find no evidence, certainly no substantial evidence, in the record to support an assertion that either doctor's hesitance to proceed with surgery was because it was unwarranted based on medical evidence (or lack thereof) alone. The record also reveals that Plaintiff continued to inquire about surgery after being told it was not the best option for her, which can reasonably support only an inference that the treatment she had received had *not* been successful in controlling her symptoms (R. 437). Coupled with her ongoing pain treatment, the record fairly suggests only that it had not. Coupled with the numerous other identified issues of Plaintiff's left leg, the undersigned cannot intuit how the ALJ purports that the objective medical evidence does not support Plaintiff's complaints or is "weak."

Further, the undersigned cannot agree that the treatment Plaintiff received was "routine and conservative" in nature, and to the extent that some of it could have been, not all of it was. In addition to an apparently constant pain medication regimen, Plaintiff also received countless regular and frequent injections in her left leg as well as her back and neck; she went to physical therapy, and she was given nerve blocks for pain. The entirety of her treatment suggests fairly only that she received practically every possible treatment except surgery, and that doctors considered surgery but were hesitant to do so based on her condition. The treatment Plaintiff underwent hardly appears routine and conservative as a whole.

In short, to the extent that the ALJ suggests Plaintiff was simply malingering with regard to the pain she experiences and the effects that pain has on her, he appears to base this largely on interpretations of select pieces of evidence, divorced from context, that do not hold up to scrutiny. The undersigned cannot find that conclusion to be supported by substantial evidence.

Finally, as to obesity, the ALJ stated that "The record identifies a diagnosis of obesity, and documents height and weight findings to establish a body mass index to support the same (Exhibits 3F, 7F, 8F, and I SF). However, this condition is not considered to exacerbate the claimant's other conditions to Listing level severity." However, that conclusory statement lacked any further explanation or elaboration as to *why*, and thus the undersigned cannot find it to be supported by substantial evidence. While in this case the argument is not necessarily that Plaintiff meets a specific listing, the ALJ's own opinion indicates that obesity is a very relevant consideration when it comes to Plaintiff's left knee, which is central to both the case and the ALJ's determination especially as to credibility.

The ALJ stated that "Someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from arthritis alone" (R. 48). The record clearly shows that Plaintiff was diagnosed with osteoarthritis in her left knee, which the ALJ explicitly recognized (R. 51). Despite that, and despite significant evidence in the record that shows Plaintiff has fallen numerous times due to her left knee "giving out" on her, sometimes sustaining serious injury and hospital visits as a result, the undersigned cannot find anything in the ALJ's opinion to suggest that this was considered and if so, how it was considered and rejected. It is also documented in the record that Plaintiff fell in precisely one such fashion and for that reason in performance of her job as a home health aide, for which she received workers' compensation benefits. As the ALJ himself concedes, obesity is directly

relevant to Plaintiff's left knee osteoarthritis, especially as it supports her subjective complaints, yet he does not address it or explain why. Further, it appears to the undersigned that beyond credibility, this may also be a relevant consideration under listing 1.04,[5] especially given Plaintiff's ongoing documented antalgic gait and neurological abnormalities.

## VI.    RECOMMENDED DECISION

For the reasons herein stated, I accordingly recommend Defendant's Motion for Summary Judgment be **DENIED,** and the Plaintiff's Motion for Summary Judgment be **GRANTED** and this matter be **REMANDED** for the reasons stated forth within.

To the extent that the ALJ's credibility determination of Plaintiff was based on an incorrect application of the law and was not supported by substantial evidence, new credibility findings must accordingly be made that are based on substantial evidence. Each medical opinion must be analyzed and weighed according to the factors mandated, and the ALJ provide substantial evidence, apart from his own lay opinion, to explain any opinion or source that is afforded less weight. Once done, the five-step process must be re-completed.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John P. Bailey, United States District Judge.  Failure to timely file objections to the Report and Recommendation set

---

[5] "Other miscellaneous conditions that may cause *weakness of the lower extremities, sensory changes,* areflexia, trophic ulceration, bladder or bowel incontinence, and *that should be evaluated under 1.04 include*, but are not limited to, *osteoarthritis* . . . In these cases, there may *be gait difficulty and deformity of the lower extremities based on neurological abnormalities, and the neurological effects are to be evaluated under the criteria in 11.00ff*" (emphasis added).

forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 30th day of November, 2016.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE